Nicholas ZAIKA, Plaintiff,

v.

DEL E. WEBB CORPORATION, an Arizona Corporation; Consolidated Casinos Corporation, a Nevada Corporation; Sahara-Nevada Corporation, a Nevada Corporation; the United States Playing Card Company, a Delaware Corporation; Thurman L. Spach, a/k/a Buddy Spach; Edward M. Nigro, Jointly and Severally, Defendants.

Civ. No. LV 79–101 RDF.

United States District Court,
D. Nevada.

March 2, 1981.

Thomas A. Howard, Detroit, Mich., for plaintiff.

James R. Olson of Cromer, Barker & Michaelson, Las Vegas, Nev., for defendant United States Playing Card Co.

Drake DeLanoy of Beckley, Singleton, DeLanoy & Jemison, and Robert D. Faiss of Lionel, Sawyer & Collins, Las Vegas, Nev., for remaining defendants.

ROGER D. FOLEY, District Judge.

## OPINION

Nicholas Zaika, a citizen of Michigan, brings this diversity action against Del E. Webb Corporation, an Arizona corporation; Sahara-Nevada Corporation, a Nevada corporation; and Consolidated Casino Corporation, a Nevada corporation (hereinafter referred to as "Corporate Defendants"). Plaintiff also brings this action against Thurman L. Spach and Edward M. Nigro (hereinafter referred to as the "Individual Defendants"). Both men are employees of the Sahara Hotel and are citizens of Nevada. Another defendant in this action is The United States Playing Card Company, a Delaware corporation (hereinafter referred to as the "Defendant Manufacturer").

Plaintiff claims as follows: that he traveled from Detroit, Michigan, to Las Vegas on or about February 13, 1977, and stayed at the Hotel Riviera three days; that while playing blackjack at the Hotel Sahara during that time, he was induced by agents of the Hotel Sahara to move to the Hotel Sahara and gamble there as a "high roller" guest; that he stayed at the Hotel Sahara four days, during which he lost a total of $30,000; that he returned to Las Vegas on April 17, 1977, at the inducement of the Hotel Sahara and proceeded to lose approximately $156,000 in cash and checks, $280,000 in markers later redeemed, and $150,000 in markers he did not redeem following an incident of May 23, 1977; that on that day, plaintiff was engaged in a number of wagering transactions at blackjack table No. 23 at the Hotel Sahara in front of a dealer by the name of Alfreda Polito; that plaintiff discovered an extra five of spades in the deck of cards and that there were 53 cards in the deck; that this extra card increased the odds in favor of the house; that prior to May 23, 1977, there had been many instances of defective decks in play at the Sahara, and that on June 3, 1977, another dealer at the same hotel discovered another defective deck.

On these alleged facts, plaintiff brings suit against the Corporate Defendants for fraud, conspiracy to defraud, breach of implied contract, and breach of quasi-contract. As against the Corporate Defendants and Individual Defendants, plaintiff alleges in-

tentional misrepresentation, negligence, negligent misrepresentation, and innocent misrepresentation. Plaintiff also alleges that defendant manufacturer is liable for negligence, strict liability, and breach of warranty. Plaintiff prays for $466,000 in wagering losses, $4 million in general damages, and $25 million in punitive damages.

This is not the first time that Mr. Zaika has sought relief. The plaintiff filed a complaint with the Gaming Control Board, one of the two state agencies that are charged with the regulation of gambling operations in Nevada, the other being the Gaming Commission. An initial investigation by Board agents determined that the Hotel Sahara was not guilty of any improper action and that the Board should not take any action in regard to the plaintiff's losses. The plaintiff appealed the determination of the agents, and Board Member Jeffrey Silver convened a hearing on December 2, 1977. The plaintiff appeared with counsel, testified, and was permitted to call witnesses. He also had an opportunity to cross-examine all other witnesses called to testify, including the Board agents in charge of the initial investigation. On December 22, 1977, the full Control Board issued a decision, based on the evidence taken at the hearing, stating that the Hotel Sahara was free from any wrongdoing and was not the cause of the plaintiff's losses. Gaming Control Board Case # 77–475 (Dec. 22, 1977).

## MOTIONS BEFORE THIS COURT

The Corporate Defendants and the Individual Defendants have moved to dismiss for failure to state claims upon which relief can be granted pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, arguing that the administrative proceeding is *res judicata*. Defendant Del E. Webb Corporation ("Webb") additionally claims that none of the duties, acts, or omissions alleged can be imputed to it, the parent corporation, and therefore the action should be dismissed. These defendants also move to strike the supplemental affidavits submitted by the plaintiff in opposition to the dismissal.

The Defendant Manufacturer filed two motions. The first motion under Rule 12(b)(6), FRCP, asks for dismissal on the basis that Nevada does not recognize a cause of action for breach of warranty where there is no privity of contract between the manufacturer and the plaintiff. The second motion is one for summary judgment pursuant to Rule 56, FRCP. This defendant also contends that the plaintiff is *collaterally estopped* from asserting his claims by the decision of the Nevada Gaming Control Board.

## RES JUDICATA AND COLLATERAL ESTOPPEL

A good comparison of the doctrines of res judicata and collateral estoppel was given in *Umberfield v. School District No. 11, Etc.*, 185 Colo. 165, 522 P.2d 730 (1974), in which the Court stated:

"Res judicata in the strict sense refers to 'claim preclusion.' ... The doctrine holds that an existing judgment is conclusive of the rights of the parties in any subsequent suit on the same claim. It bars relitigation not only of all issues actually decided, but of all issues that might have been decided. It requires an identity of parties or their privies ..., as it would be unfair to preclude a party from litigating an issue merely because he could have litigated it against a different party.

"Collateral estoppel, on the other hand, refers to 'issue preclusion.' The doctrine holds that the final decision of a court on an issue actually litigated and determined is conclusive of that issue in any subsequent suit ... Collateral estoppel is broader than res judicata in that it applies to a cause of action different from that involved in the original controversy. It is narrower, however, in that it does not apply to matters which could have been litigated but were not." Id. at 732. (Citations omitted.)

The State of Nevada provides two methods of dealing with a claim by a player that he was cheated in a wagering transaction, one is *administrative* and the other is *judi-*

*cial.* The administrative remedy is outlined in Gaming Control Board Bulletin No. 7 (Dec. 5, 1972) as follows:

"1. The investigating agent will perform whatever investigative steps he deems necessary to enable him to render a just decision on the merits of the player's claim.

" . . .

" . . .

"3. Review of an agent's decision by a Board member may be had by requesting such review . . .

" . . .

"3.4 The Board member may sustain, modify or reverse the agent's decision and *his decision is not subject to further review.*

"4. It shall be deemed an unsuitable method of operation for a licensee to fail to pay a player's claim after having been directed to do so by the Board or its agents pursuant to this Bulletin. Such failure may result in a complaint being filed with the Commission pursuant to NRS 463.310, 463.312 and Reg. 7." (Emphasis added.)

Ordering a licensee to pay a player's claim is merely incidental to the Gaming Control Board's supervisory function of insuring that gaming licensees operate in a suitable manner. If the Board finds that a player has been cheated, it may direct the gaming licensee to give the player his money back under the threat that the Board will otherwise file a complaint with the Gaming Commission seeking to fine the licensee or revoke the license. Neither the Gaming Control Board nor the Gaming Commission have the power to award a judgment to a player who has been cheated.

The Corporate Defendants argue that this administrative remedy is the exclusive remedy for the plaintiff under Nevada law. They argue that since Nevada courts do not enforce gaming debts, *Sea Air Support, Inc. v. Herrmann*, Nev., 613 P.2d 413 (1980); *Corbin v. O'Keefe*, 87 Nev. 189, 484 P.2d 565 (1971); *Weisbrod v. Fremont Hotel, Inc.*, 74 Nev. 227, 326 P.2d 1104 (1958); *West Indies v. First Nat'l Bank*, 67 Nev. 13, 214 P.2d 144

(1950), Nevada courts would not recognize a cause of action involving gaming losses where there has been an allegation of cheating. This issue of whether there is a judicial remedy where a player claims he was cheated by a licensee has been resolved by the Ninth Circuit in *Berman v. Riverside Casino Corp.*, 323 F.2d 977 (9th Cir. 1963). In that case, a California resident brought suit against a casino to recover moneys he said he lost because the casino used loaded dice. The Court held that the Supreme Court of Nevada would recognize such a claim. Id. at 979.

Given the two types of relief available under the laws of Nevada, this Court must decide whether the doctrines of res judicata and collateral estoppel apply to the determination made by the Gaming Control Board. The Supreme Court of Nevada adopted both doctrines in regard to judicial decisions in *Paradise Palms Community Ass'n v. Paradise Homes*, 89 Nev. 27, 505 P.2d 596 (1973). However, this Court has found no decision of the Nevada Supreme Court applying these doctrines to an administrative determination. In the absence of controlling Nevada decisions, this Court must decide the question as it believes the Nevada Supreme Court would do so. *Bowen v. United States*, 570 F.2d 1311, 1320 (7th Cir. 1978).

In order for these doctrines to apply to judicial decisions, there must be a valid final judgment rendered on the merits, a subsequent action involving the same parties or those in privity with them, and based on the same cause of action or claim. *Hooker v. Klein*, 573 F.2d 1360, 1367 (9th Cir. 1978); *Paradise Palms Community Ass'n v. Paradise Homes*, 89 Nev. 27, 505 P.2d 596, 599 (1973). In considering the application of the doctrines to administrative determinations, courts often inquire into the nature of the proceeding before the specific agency. For example, in *Painter's District Council No. 38, Etc. v. Edgewood Contracting*, 416 F.2d 1081 (5th Cir. 1969), the Court applied the doctrine of res judicata to a determination of the National Labor Relations Board on the issue of liability

which was relevant in a subsequent damage suit. The Court stated that "The policy considerations which underlie res judicata—finality to litigation, prevention of needless litigation, avoidance of unnecessary burdens of time and expense—are as relevant to the administrative process as to the judicial." Id. at 1084. The Court, in *Painter's*, described what it found to be the minimal procedures necessary to establish a judicial type forum so that res judicata could apply. They included a full hearing, representation by counsel, a full opportunity to present evidence, and the right to call, examine and cross-examine witnesses.

■ Another factor considered by courts in applying the doctrines to administrative determination is whether the party has an opportunity for some type of judicial review on a record. In the leading case of *United States v. Utah Constr. & Min. Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), the Supreme Court stated:

> "In the present case the Board was acting in a judicial capacity ... the factual disputes resolved were clearly relevant to the issues properly before it, and both parties had a full and fair opportunity to argue their version of the facts and *an opportunity to seek* court review of any adverse findings." (Emphasis added.)

The opportunity to seek judicial review from an administrative determination is implicit in the doctrines of res judicata and collateral estoppel. When the doctrines are applied to previous judicial decisions, the courts usually assume that the party had a right to appeal on the record. The right to seek judicial review is an important factor in determining if the doctrine applies to the decision of an administrative agency. See *Bowen v. United States*, 570 F.2d 1311, 1315 (7th Cir. 1978); *Painter's District Council*

*No. 38, Etc. v. Edgewood Contracting Co.*, 416 F.2d 1081, 1083 (5th Cir. 1969); *Campbell v. Superior Court in and for Cty. of Maricopa*, 18 Ariz.App. 287, 501 P.2d 463 (1972); *Umberfield v. School District No. 11, Etc.*, 185 Colo. 165, 522 P.2d 730, 734 (1974).

■ This Court will not decide whether the hearing conducted in front of Board Member Jeffrey Silver and the subsequent opinion issued by the full Gaming Control Board contained the minimal procedures necessary for the application of the doctrines of res judicata and collateral estoppel and constitute a final judgment. These questions should be determined by the Nevada Supreme Court or the Nevada legislature, not a federal court. However, this Court believes that the Nevada Supreme Court would not apply these doctrines to the determination made by the Gaming Control Board for another reason. This Court reaches this conclusion because the plaintiff and the licensee had unequal rights to a review of the Board's determination under Nevada law.

It is an unsuitable method of operation for a licensee to fail to pay a player's claim if directed to do so by the Board after it has found that the player has been cheated. Gaming Control Board Bulletin No. 7, paragraph 4 (Dec. 5, 1972). Nevada Revised Statutes 463.310 provides that the Control Board can file a complaint with the Gaming Commission if it finds that a licensee has operated in an unsuitable manner. In filing the complaint, the Board transmits a summary of the evidence and a transcript of the investigative hearing to the Commission. See *NRS 463.310(2)*. If the Commission finds there are probable grounds for disciplinary action, it conducts a full hearing on the matter in accordance with NRS 463.312. See *NRS 463.310(3)*.[1] The Com-

1. NRS 463.310 provides in part:
    2. If, after any investigation the board is satisfied that a license, registration, finding of suitability, pari-mutuel license or prior approval by the commission of any transaction for which such approval was required or permitted under the provisions of this chapter or chapter 464 of NRS should be limited, conditioned, sus-

pended or revoked, it shall initiate a hearing before the commission by filing a complaint with the commission in accordance with NRS 463.312 and transmit therewith a summary of evidence in its possession bearing on the matter and the transcript of testimony at any investigative hearing conducted by or on behalf of the board.

mission then has the power to discipline the licensee as specified in NRS 463.310(4). The aggrieved licensee then has a right to judicial review in the courts of Nevada on a complete record of the previous proceedings. *NRS 463.315.*[2] Therefore, if the licensee refuses to pay a player's claim after an adverse decision by the Gaming Control Board, it has in effect a right to further administrative review in front of the Gaming Commission and judicial review in Nevada courts.

But neither the Nevada statutes nor gaming regulations provide a similar procedure for review to a complainant, such as plaintiff here, who receives an adverse decision from the Gaming Control Board. Judicial review under NRS 463.315 is provided only for disciplinary proceedings in front of

3. Upon receipt of the complaint of the board, the commission shall review it and all matter presented in support thereof, and, if satisfied that probable grounds exist for disciplinary or other action, shall conduct further proceedings in accordance with NRS 463.312. If the commission is not satisfied that probable grounds exist for disciplinary or other action, it may order the complaint withdrawn without prejudice to the filing of another complaint after further investigation and reconsideration by the board.

4. After the provisions of subsections 1, 2 and 3 above have been complied with, the commission may:

(a) Limit, condition, suspend or revoke the license of any licensed gaming establishment or the individual license of any licensee without affecting the license of the establishment;

(b) Limit, condition, suspend or revoke any registration, finding of suitability, pari-mutuel license, or prior approval given or granted to any applicant by the commission;

(c) Order a licensed gaming establishment to keep an individual licensee from the premises of such licensed gaming establishment or not to pay such licensee any remuneration for services or any profits, income or accruals on his investment in such licensed gaming establishment; and

(d) Fine the licensee, registrant, person or entity previously found suitable, pari-mutuel licensee, or person or entity who previously obtained approval for any act or transaction for which commission approval was required or permitted under the provisions of this chapter or chapter 464 of NRS, not more than $100,000 for the first violation and not more than $250,-000 for each subsequent violation of the provisions of this chapter, chapter 464 or chapter 465 of NRS or of the regulations of the commission.

2. NRS 463.315 provides in part:

1. Any person aggrieved by a final decision or order of the commission made after hearing or rehearing by the commission pursuant to NRS 463.312, and whether or not a petition for rehearing was filed, may obtain a judicial review thereof in the district court of the county in which the petitioner resides or has his or its principal place of business.

.    .    .    .    .

7. The complete record on review must include copies of:

(a) All pleadings in the case;

(b) All notices and interim orders issued by the commission in connection with the case;

(c) All stipulations;

(d) The decision and order appealed from;

(e) A transcript of all testimony, evidence and proceedings at the hearing;

(f) The exhibits admitted or rejected; and

(g) Any other papers in the case.

The original of any document may be used in lieu of a copy thereof. The record on review may be shortened by stipulation of all parties to the review proceedings.

.    .    .    .

.    .    .    .

10. The review must be conducted by the court sitting without a jury, and must not be a trial de novo but is confined to the record on review.

11. The reviewing court may affirm the decision and order of the commission, or it may remand the case for further proceedings or reverse the decision if the substantial rights of the petitioner have been prejudiced because the decision is:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the commission; or

(c) Made upon unlawful procedure; or

(d) Unsupported by any evidence; or

(e) Arbitrary or capricious or otherwise not in accordance with law.

12. Any party aggrieved by the final decision in the district court after a review of the commission decision and order may appeal to the supreme court in the manner and within the time provided by law for appeals in civil cases. The supreme court shall follow the same procedure thereafter as in appeals in civil actions, and may affirm, reverse or modify the decision as the record and law shall warrant.

13. The judicial review by the district and supreme courts afforded in this chapter is the exclusive method of review of commission actions, decisions and orders, and precludes the use of any of the extraordinary common law writs or other equitable proceedings.

the Gaming Commission and not for any determinations made by the Gaming Control Board. In addition, while a licensee can refuse to pay a complainant and get a full hearing in front of the Gaming Commission after the Board has filed a complaint, there are no similar provisions for such administrative review of an adverse decision against the complainant. There are also no provisions for the transmission of a record of the investigative hearing in the absence of the Board filing a complaint with the Commission under NRS 463.310(2), and no such record was provided to this Court. Furthermore, both the Gaming Control Board and the Gaming Commission are exempt from the judicial review and transmission of record sections of Nevada's Administrative Procedures Act. *NRS 233B.039.* Therefore, the doctrines of res judicata and collateral estoppel do not apply to a determination made by the Gaming Control Board where the complainant does not at least have the same right to a review as a licensee which receives an adverse ruling from the Board.

The motion to dismiss under Rule 12(b)(6) on behalf of the corporate defendants and the individual defendants is hereby denied. The motion for summary judgment under Rule 56, FRCP, on behalf of Defendant Manufacturer is also denied. Since this Court has denied the motion as a matter of law as to the effect of res judicata, it need not decide the motion to strike certain supplemental affidavits alleging facts inconsistent with the findings of the Gaming Control Board.

## MOTION TO DISMISS AS TO DEFENDANT DEL E. WEBB CORPORATION

Defendant Webb seeks dismissal from the action on the additional grounds that the complaint fails to state a claim upon which relief can be granted. The relationship of Webb to the other two defendant corporations in this action is that of sole stockholder. Webb is not involved in the operation or management of the Sahara Hotel and Casino. "Generally, a corporation and its stockholders are deemed separate legal enti-

ties and stock ownership in itself is not sufficient to charge the parent company with responsibility for acts of the subsidiary." *Spears v. Transcontinental Bus System,* 226 F.2d 94, 98 (9th Cir. 1955). This principle was recognized by this Court in *Jackson v. Continental Trailways, Inc.,* 65 F.R.D. 451 (D.Nev.1974).

Plaintiff asserts that the mere fact that Webb is a licensee means that it incurs liability for corporate obligations generated by gaming operations in which it owns stock. But this issue was resolved in *Berman v. Riverside Casino Corp.,* 247 F.Supp. 243 (D.Nev.1964), aff'd, 354 F.2d 43 (9th Cir. 1965). The Court held that a stockholder of a private corporation licensed under the requirements of the Nevada Gaming Control Act to operate a casino does not, by reason that he himself is also licensed under the requirements of the Act, incur liability for corporate obligations generated by gaming operations. Id. at 245. Even though the relevant sections of the Act have been amended somewhat since that time (NRS 463.010 et seq.), this Court still finds the analysis equally valid today. The intent of the Nevada legislature in requiring that persons having interests in a corporate licensee also be licensed, was to eliminate undesirables from participation in licensed gambling. Id. at 250. Such a requirement does not change Nevada corporate law that stockholders do not incur liability for corporate obligations generated by gaming operations. Id. at 245.

"No claim for relief is stated if the complaint pleads facts insufficient to show that a legal wrong has been committed, or omits an averment necessary to establish the wrong or fails so to link the parties with the wrong as to entitle the plaintiff to redress." *Sutton v. Eastern Viavi Co.,* 138 F.2d 959, 960 (7th Cir. 1943). In this case, the facts plead are insufficient as against defendant Webb. Therefore, plaintiff's action is hereby dismissed as to defendant Webb.

## MOTION TO DISMISS BREACH OF WARRANTY CLAIM

Defendant Manufacturer made a motion to dismiss for failure to state a

claim upon which relief can be granted pursuant to Rule 12(b)(6). The motion concerns the breach of warranty claim and Nevada law is clear on this point. NRS 104.2318 provides:

"A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such persons may use, consume or be affected by the goods and who is injured in person by breach of warranty. A seller may not exclude or limit the operation of this section."

While Nevada does not require vertical privity in actions for personal or property injury caused by defective products, it still requires the horizontal privity mandated by the statute. *Hiles Co. v. Johnson Pump Co. of Pasadena*, 93 Nev. 73, 560 P.2d 154, 157 (1977); *Amundsen v. Ohio Brass Co.*, 89 Nev. 378, 513 P.2d 1234 (1973); *Long v. Flanigan Warehouse Co.*, 79 Nev. 241, 382 P.2d 399 (1963). Plaintiff simply does not come within the class of persons protected by the statute. Therefore, the motion to dismiss the breach of warranty claim on behalf of Defendant Manufacturer is hereby granted.