**The SIERRA CLUB, a California Corporation, Oregon Natural Resources Council, an Oregon Corporation, Middle Santiam Wilderness Committee, an Oregon Corporation, John Patt, Plaintiffs,**

**v.**

**John BLOCK, R. Max Petersen, Jeff Sirman, Michael Kerrick, James Pierce, Willamette Industries, Inc., an Oregon Corporation, Defendants.**

Civ. No. 82–1576–PA.

United States District Court,
D. Oregon.

Nov. 30, 1983.

Kent Hickam, Albany, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Robert M. Simmons, Sp. Asst. U.S. Atty., Portland, Or., for defendants John Block, R. Max Petersen, Jeff Sirman, Michael Kerrick, and James Pierce.

Douglas M. Ragen, John F. Neupert, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendant Willamette Industries, Inc.

## OPINION AND ORDER

PANNER, District Judge.

This action for declaratory and injunctive relief challenges certain actions of the defendants in planning for and approving a timber sale, harvesting activities, and road construction in the Middle Santiam roadless area of the Willamette National Forest.

The timber sale at issue is referred to as the Pyramid timber sale.

Plaintiffs are several environmental groups and one individual who is a member of two of the plaintiff groups. Defendants are Forest Service officials and Willamette Industries, Inc. The Forest Service is responsible for planning for and approving the timber sale and related activities. Willamette Industries, Inc. is an Oregon corporation that purchased the challenged timber sale.

The parties seek summary judgment on the first two claims of plaintiffs' complaint. Claims three through seven have been dismissed with prejudice by stipulation. Plaintiffs' first claim has been characterized as the "floodplain claim." This claim alleges that the timber sale provides for rerouting of Forest Service Road 2041 into a floodplain of the Middle Santiam River. Plaintiffs contend that the federal defendants failed to comply with provisions of the Forest Service Manual in planning for development to occur on the floodplain. Plaintiffs' second claim alleges violations of the National Environmental Policy Act (NEPA). Plaintiffs assert that the Willamette Forest Plan is deficient as an environmental impact statement (EIS) because it does not contain an adequate discussion of the wilderness potential of the Middle Santiam roadless area. Plaintiffs contend that the Forest Service should have prepared a supplemental EIS before approving the Pyramid timber sale.

Defendant Willamette Industries's cross-motions for summary judgment are granted as to both the floodplain claim and the NEPA claim.

## FACTUAL BACKGROUND

The Pyramid timber sale is located in the Willamette National Forest in Oregon. A substantial portion of the timber sale and associated road construction is in what has been described as the Middle Santiam roadless area.

The Forest Service first began developing the Middle Santiam area in 1965, when Forest Service Road 2041 was constructed.

Prior to the development activities associated with the Pyramid timber sale and the adjacent Donaca Gordon timber sale, there were approximately ten and one-half miles of road, two concrete bridges, and twenty-eight harvested clear-cut units affecting 570 acres.

In 1975 the Forest Service issued a draft EIS on the Multiple Use Land Management Plan for the Willamette National Forest. The draft EIS considered various alternative land use and timber management plans for the five planning units on the Willamette National Forest. The draft was circulated for public comment, and public presentations and meetings were held. The Forest Service also conducted an intensive study of roadless areas on the Forest for analysis of their wilderness potential.

On April 18, 1977, the Forest Service issued a final EIS described as the Willamette Forest Plan (hereinafter Willamette Plan). The Willamette Plan proposed that the Middle Santiam roadless area, including the Pyramid sale area, be managed under a general forest category, which permits timber harvest and road construction. According to the plan, the primary objective of general forest areas is "multiple use management of all resources," with emphasis given to "sustained timber yield commensurate with the land's natural capability and investment levels."

The Willamette Plan is a "programmatic EIS." A programmatic EIS presents a broad-based, long-range plan that discusses the overall environmental impacts of the proposed action. When an agency later decides to implement an individual project, an "environmental assessment" (EA) is prepared. The EA concentrates on the issues specific to the subsequent action, and need only summarize the issues discussed in the programmatic statement. 40 C.F.R. § 1502.20. The EA is intended to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.-9(a)(1).

On November 7, 1977, the Regional Forester issued a Decision Statement approving the Willamette Plan. Because the Department of Agriculture had, on May 6, 1977, recommended to Congress that the Middle Santiam roadless area be designated as wilderness, implementation of the Willamette Plan was deferred pending a decision by Congress or the Administration on such a designation.

Several environmental groups pursued an administrative appeal of the decision approving the Willamette Plan. Two of the plaintiffs in this action, the Sierra Club and the Middle Santiam Wilderness Committee, were appellants in that administrative review. One of the issues appealed was the sufficiency of the plan's evaluation of the wilderness potential of roadless areas in the Forest. On July 20, 1978, the Chief of the Forest Service issued a final administrative decision sustaining the portions of the plan relevant to this action. No party sought judicial review of the Chief's final decision.

In June, 1977, the Forest Service initiated the "Roadless Area Review and Evaluation" (RARE II) process. RARE II was the Forest Service's second attempt to evaluate programmatically the roadless areas in the National Forest system. This evaluation was undertaken to accelerate the roadless portion of the Forest Service land management process. The original RARE II inventory included undeveloped roadless areas that had not been allocated to non-wilderness uses by a filed land management plan and that met minimum criteria for inclusion in the National Wilderness Preservation System. It also included some thirty-four areas that had been through the land management planning process and allocated to nonwilderness use, but which had been identified for additional review.

The Middle Santiam roadless area was not included in the original RARE II inventory. It was added on December 27, 1977, by the Acting Deputy Chief of the Forest Service, at the request of the congressional committees considering legislation that be-

came the Endangered American Wilderness Act. When the final RARE II EIS was issued in 1979, the Middle Santiam was allocated to nonwilderness, just as it had been in the Willamette Plan.

On October 22, 1982, the Ninth Circuit, in *California v. Block*, 690 F.2d 753 (9th Cir. 1982), affirmed a California district court ruling that the RARE II EIS was inadequate under NEPA.

On August 26, 1980, the Forest Service issued a Decision Notice and Finding of No Significant Effect in connection with its decision to implement the Pyramid timber sale. The Decision Notice incorporated an environmental assessment that discussed site specific environmental effects associated with timber harvesting and road building. The Decision Notice concluded that "[t]he assessment indicates no significant effects on the environment beyond those appropriate for the land management allocation approved in the [Willamette National Forest] Land Management Plan. Therefore, no Environmental Statement will be prepared."

The Oregon Wilderness Coalition, now the Oregon Natural Resources Council, filed an administrative appeal of the Decision Notice. On March 30, 1982, the Forest Service Chief issued the final administrative decision denying the appeal. On July 26, 1982, the Forest Service conducted an oral auction of the Pyramid timber sale. Willamette Industries was awarded the contract on August 18, 1982. Plaintiffs filed this lawsuit on December 22, 1982.

The Pyramid timber sale contract provides for the harvesting of approximately 9.4 million board feet of timber and the construction or reconstruction of approximately 14.4 miles of road. The reconstruction project entails reconstructing a portion of Forest Service Road 2041 around a large landslide known as the Middle Santiam slide. The value of the entire contract is estimated to be $1.7 million.

In 1982 Willamette Industries "pioneered" the road segment around the Middle Santiam slide. "Pioneering" involves the falling of right-of-way timber, stump removal, and rough grading of the road. Willamette Industries began felling operations in February, 1983, and continued for several weeks. Approximately two miles of road right-of-way has been logged and almost a mile of that cleared has been graded. Approximately 760,000 board feet of timber has been cut and is in need of removal. Willamette Industries has entered into two contracts for road construction and right-of-way logging in connection with the timber sale. The Pyramid sale timber is of high quality and relatively low cost. The cost of substitute timber has been estimated to be at least $1.2 million more than the Pyramid timber.

On February 24, 1983, Congressman Morris Udall requested that the Department of Agriculture direct the Forest Service to refrain from conducting, selling, or awarding any further timber sales in areas proposed for wilderness designation in H.R. 1149, the Oregon Wilderness Act of 1983. The Department of Agriculture agreed on March 23, 1983 to defer initiation of new development activities in such areas for ninety days. On March 29, 1983 the Forest Supervisor relayed Congressman Udall's request to Willamette Industries because the Middle Santiam area is among those areas proposed for wilderness designation in H.R. 1149. The bill passed the House of Representatives on March 21, 1983, and is pending before the Senate. The Forest Service has agreed to delay new developmental activities until December 31, 1983.

## FLOODPLAIN CLAIM

Title 2500 of the Forest Service Manual governs planning for Forest Service action on floodplains. The Pyramid timber sale transportation plan provides that Forest Service Road 2041 be rerouted around the Middle Santiam slide. Plaintiffs contend that this aspect of the timber sale constitutes an action affecting a floodplain and is therefore governed by title 2500 of the Forest Service Manual.

Title 2500 sets forth procedural steps to be followed by the Forest Service when considering projects located on floodplains or having the potential to affect a floodplain. The procedural steps include public notice and comment on the decision-making process, identification and analysis of alternative sites outside the floodplain, and consideration of mitigating measures.

The Forest Service issued two decision notices concerning the implementation of the plan to reroute Road 2041. On April 24, 1980, the Forest Service issued a Decision Notice and Finding of No Significant Effect in connection with the decision to implement the Pyramid timber sale, and on March 23, 1983, it issued a Decision Notice addressing erosion control measures for the reroute. Plaintiffs' contend that neither of these decision notices complied with title 2500 of the Forest Service Manual. Plaintiffs' primary complaint is that there was insufficient opportunity for public comment on the possibility of alternate routes for Road 2041.

The federal defendants concede that their initial investigations did not reveal that the reroute of Road 2041 would cross a floodplain. Subsequent investigations showed, however, that approximately 40 feet of the 6,000 foot bypass around the slide and as much as 4 feet of the 14 foot road prism within that 40 feet is located on a channel cut by a flood that was in excess of a 100 year flood. The channel was only partially reoccupied by a flood in 1964. Defendants argue that all practicable alternatives to the proposed action were explored at the time of the initial decision, and that the reroute selected was the only practicable alternative. They characterize this as a *de minimis* situation: the Forest Service has concluded that only a small portion of the road is located on the floodplain, that the floodplain is not active, and that in the event of a 100 year flood, the road will not be jeopardized and will not contribute sediment to the Middle Santiam River.

Defendants also assert that plaintiffs' floodplain claim is untimely. They contend that plaintiffs are precluded in this action from raising the issue of the Forest Service's failure to comply with provisions of the Forest Service Manual regarding floodplains because they did not raise the issue at the administrative level.

The administrative record indicates that no party raised, at the administrative level, the issue of noncompliance with the Forest Service Manual. Interested parties did, however, express concern about the reroute crossing the river terrace, or floodplain, and being susceptible to washouts. The record contains a report from a soil scientist identifying this as a potential problem. The Forest Service was alerted to the factual issues associated with rerouting the road across the floodplain, even if noncompliance with the Forest Service Manual was not specifically raised.

The question arises, however, whether errors, if any, by the Forest Service in complying with technical provisions of the Manual regarding public comment on alternatives should be the basis for enjoining the project at this late stage. The administrative record indicates that there was opportunity for public participation in the decision to reroute the road around the slide, and that members of the public did participate. The affidavits of Forest Service officials involved in the decision demonstrate that the entire purpose of the project was to reduce the potential for environmental impacts to a major watershed. The district ranger and district geologist have stated that various alternatives for accessing the timber sale area were analyzed, and that construction of the bypass around the slide was the only practicable alternative.

The road is virtually complete: all that remains is placement of rock, together with seeding, mulching, and fertilizing. Given this reality, and the Forest Service's conclusions that the reroute will not result in any adverse impact to the floodplain, it would serve no purpose to require the Forest Service to repeat procedural steps already substantially employed. Defend-

ants' motion for summary judgment is GRANTED as to the floodplain claim.

## NEPA CLAIM

Plaintiffs contend that the Willamette Plan is an insufficient EIS to support the Pyramid timber sale because the plan's evaluation of the wilderness potential of the area fails to comply with NEPA requirements. Given this fact, argue plaintiffs, a site-specific EIS is needed for the area.

Forest Service planning for the Middle Santiam area was developed pursuant to a "tiering" concept. The Council on Environmental Quality has described the concept this way:

"Tiering" refers to the coverage of general matters in broader environmental impact statements ... with subsequent narrower statements of environmental analyses ... incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28. Tiering helps the agency focus on the issues which are ripe for decision and exclude from consideration those issues already decided. *Id.* Whenever a programmatic EIS has been prepared, the subsequent EA need only summarize the issues discussed in the EIS and may concentrate on the issues specific to the subsequent action. *See* 40 C.F.R. § 1502.20; *Ventling v. Bergland*, 479 F.Supp. 174, 179 (D.S.D.1979).

A programmatic EIS will often be insufficient as it relates to site-specific actions. This may be because it does not contain sufficient detail to satisfy NEPA requirements, or because new information is revealed subsequent to its preparation. But, "where the programmatic EIS is sufficiently detailed, and there is no change in circumstances or departure from the policy in the programmatic EIS, no useful purpose would be served by requiring a site-specific EIS." *Ventling*, 479 F.Supp. at 180. ·

■ The sufficiency of the programmatic EIS is subject to challenge through administrative and judicial appeals. A judicial appeal is appropriate, of course, upon denial of an administrative challenge to the EIS.

Where no party seeks a judicial appeal of the EIS, however, principles of finality and avoidance of duplicitous litigation require that the administrative decision be considered final as to the issues determined at the administrative level. These principles underlie both the "tiering" concept under NEPA and the legal doctrines of res judicata and collateral estoppel. The acting agency is entitled to expect that, absent changes in circumstances, issues adequately addressed in a programmatic EIS will not be revived and relitigated when the agency undertakes specific action pursuant to the plans in the EIS.

■ Collateral estoppel operates to bar litigation of issues previously raised, litigated, and determined in a prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Courts have come to recognize that the policies supporting the application of collateral estoppel to judicial decision are equally relevant to administrative decisions. *See, e.g., United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966); *Bowen v. United States*, 570 F.2d 1311, 1320–23 (7th Cir. 1978); *Painters District Council No. 38 v. Edgewood Contracting*, 416 F.2d 1081, 1083–84 (5th Cir.1969); *Zaika v. Del E. Webb Corp.*, 508 F.Supp. 1005, 1009–10 (D.Nev.1981).

■ The right to seek judicial review from an administrative determination is an essential factor in determining whether to apply the doctrine of collateral estoppel to an administrative decision. *Zaika,* 508 F.Supp. at 1009, *citing Utah Construction & Mining*, 384 U.S. at 422, 86 S.Ct. at 1560. Where a party had a full and fair opportunity to litigate an issue in an administrative proceeding but failed to seek judicial review at the appropriate time, it is necessary and sound to bar relitigation of the issue in a subsequent judicial proceeding. *See Ness*

*Investment Corp. v. United States,* 219 Ct.Cl. 440, 595 F.2d 585, 588 (Ct.Cl.1979) (Prior board of forest appeals decision regarding government's unilateral reduction of special use permit was res judicata as to such issue raised in the Court of Claims where no appeal was taken from the administrative decision.); *Bowen v. United States,* 570 F.2d at 1320–22; 3 DAVIS, ADMINISTRATIVE LAW § 21 (2d ed. 1983). The integrity of the administrative process is threatened when agencies' intentions and participants' expectations as to the finality of administrative decisions are not upheld in the face of subsequent challenges.

The form and timing of challenges to administrative decisions have been identified as important general considerations in judicial review of NEPA compliance:

> [W]hile it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.

*Vermont Yankee Nuclear Power v. Natural Resources Defense Council,* 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978). The *Vermont Yankee* court also cautioned: "[T]he role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review." *Id.* at 553, 98 S.Ct. at 1216. A review of the factual background of this controversy demonstrates that these considerations are relevant to this action.

The Willamette Plan was approved by the Regional Forester on November 7, 1977. The plan designated the Pyramid timber sale area as general forest, a land use designation permitting logging and road construction. Plaintiffs Sierra Club and Middle Santiam Wilderness Committee, among others, filed an administrative appeal of the Regional Forester's decision approving the plan. The appeal raised the issue of the adequacy of the plan's evaluation of the wilderness potential of roadless areas in the Willamette Forest, including the question of the sufficiency of the plan's evaluation of alternatives to the proposed action.

On July 20, 1978, the Forest Service Chief sustained the Willamette Plan with respect to the wilderness issue. Plaintiffs Sierra Club and Middle Santiam Wilderness Committee did not seek judicial review of the Chief's decision.

In reliance on the Chief's decision, the Forest Service proceeded with plans for development of the areas designated for general forest use by the plan, including the Pyramid timber sale area. On August 25, 1980, the Forest Supervisor approved the Decision Notice and Finding of No Significant Effect for the Pyramid timber sale. Plaintiff Oregon Natural Resources Council, then called the Oregon Wilderness Coalition, appealed the decision. On March 20, 1982, the Chief issued a final administrative decision denying the appeal. Willamette Industries was awarded the contract for the timber sale on August 18, 1982, and began work shortly thereafter. Plaintiffs filed this action on December 22, 1982.

The basis for the plaintiffs' challenge to the Pyramid timber sale is the contention that the Willamette Plan, the programmatic EIS supporting the decision to implement the sale, failed to adequately consider the wilderness potential of the sale area, including the range of alternatives to the sale as proposed. Plaintiffs also initially contended that a supplemental EIS was necessary because significant new information concerning soil stability problems became known after the Willamette Plan was issued. They appear to have abandoned this argument, however, in the face of defendants' evidence that soil stability problems were addressed both in the Willamette Plan and the environmental assessment of the Pyramid timber sale.

The critical issue raised by plaintiffs' challenge to the Pyramid timber sale, then,

is the same issue raised by the original challenge to the Willamette Plan: the adequacy of the plan's evaluation of the wilderness potential of roadless areas. That issue was necessarily determined when that aspect of the plan was upheld on administrative review. Under collateral estoppel principles, "once an issue is actually litigated and necessarily determined, that determination is conclusive in subsequent suits based on a different cause of action but involving a party or privity to the prior litigation." *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1000 (9th Cir.1980), *citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).

Plaintiffs Sierra Club and Middle Santiam Wilderness Committee were parties to the administrative appeal challenging the Willamette Plan. Plaintiff John Patt is a member of both groups. The Oregon Natural Resources Council was not a party to the administrative appeal, however. The question arises whether it is appropriate, under the circumstances, to apply collateral estoppel principles against it. The Ninth Circuit has said, "Courts are no longer bound by rigid definitions of parties or their privies for purposes of applying collateral estoppel or res judicata." *ITT Rayonier*, 627 F.2d at 1003; *Jackson v. Hayakawa*, 605 F.2d 1121, 1126 (9th Cir.1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). The parties to the original administrative appeal of the Willamette Plan sought recognition not of any interests peculiar to themselves, but rather vindication of the public right to require Forest Service compliance with NEPA. "Courts have recognized that a non-party may be bound if a party is so closely aligned with its interests as to be its 'virtual representative.'" *ITT Rayonier*, 627 F.2d at 1003, *citing Aerojet General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975).

Whether I apply the concept of virtual representation or simple common sense, the interests of plaintiffs in this case appear sufficiently close under the circum-

stances to preclude relitigation of the issue already resolved at the administrative level. The structure of the planning process under NEPA presupposes a similar approach. The "tiering" concept provides that when a programmatic EIS adequately considers the issues which are ripe for decision at that stage, subsequent environmental analyses of particular projects need not reconsider the issues discussed in the EIS. Challenges to the programmatic EIS must be pursued by way of administrative and judicial review of that EIS, and not in the context of judicial review of plans for a particular project. A different situation exists, of course, where the challenge to a particular project raises issues not addressed in the programmatic EIS or where significant new information is revealed subsequent to the preparation of the EIS. Absent such a situation, however, the agency responsible for a project is entitled to rely on the administrative decision upholding the supporting EIS when no party seeks judicial review of that EIS.

In applying this analysis to the facts of this case, it becomes apparent that the *California v. Block* decision, 690 F.2d 753 (9th Cir.1982), invalidating the RARE II EIS is irrelevant to the resolution of this action. The Willamette Plan was developed, and the final EIS issued, prior to the commencement of RARE II by the Forest Service. The Middle Santiam roadless area was not included in the original RARE II inventory, but was added later. The Willamette Plan, because it was completed prior to the initiation of RARE II, could not rely on or incorporate by reference the analysis of the wilderness issue undertaken in the RARE II EIS. The Willamette Plan allocated the Middle Santiam roadless area to nonwilderness, and this allocation was not modified by the subsequent RARE II process.

The Forest Service Chief issued his final decision upholding the Willamette Plan in July, 1978. Implicit in this decision was an administrative determination that the Willamette Plan reflected an adequate evaluation of the wilderness potential of the Mid-

dle Santiam roadless area. Subsequent environmental assessments in connection with the Pyramid timber sale were not required to address this issue again, but were properly limited to issues specific to the timber sale.

This procedural background constrains me from undertaking a review of the sufficiency of the Willamette Plan in the context of this action. There was an appropriate time and means for interested parties to challenge the sufficiency of the wilderness evaluation contained in the plan. That time was upon denial of the administrative appeal, and the means was by judicial review of that administrative decision. By failing to seek judicial review at the appropriate time, plaintiffs implicitly acquiesced in the determination of the sufficiency of the Willamette Plan and the land allocations contained therein, including the potential for timber harvesting in the Middle Santiam roadless area.

Defendants are entitled to summary judgment on plaintiffs' NEPA claim.

## CONCLUSION

Defendants' motion for summary judgment on the first two claims of plaintiffs' complaint is GRANTED. Plaintiffs' motion for summary judgment is DENIED.

IT IS SO ORDERED.